## II.

## The Attorney General of Guam Maintains Common Law *Parens Patriae* Standing to Sue on Behalf of the People of Guam.

The challenge to the Attorney General of Guam's *parens patriae* standing to bring this action has no merit. Congress mandated that the Attorney General shall be the Chief Legal Officer of the Government of Guam. 48 U.S.C. § 1421g(d)(1). Congressional history reflects that the 1998 language arose from states which utilized "chief legal officer" language in their Constitutions for their Attorneys General. **Exhibits A-E.** Noteworthy is the Congressional change of the language from the bill as introduced to the final version of the bill as passed, making for a strong, independent and autonomous Attorney General. **Exhibit F.**

The standing of a State to bring a *parens patriae* action in matters of great public import or affecting the public health or economic welfare is well established. The Attorney General of Guam maintains common law powers to sue on behalf of the People. *Lyons v. Ryan*, 201 Ill. 2d 529, 780 N.E.2d 1098 (Ill. 2002). The quasi-sovereign or sovereign interest of the Government of Guam in the equal and fair assessment of property values affects the health and welfare of the local economy, impacts the People's ability to borrow money as a Government by floating bonds at favorable rates in the financial marketplace, and the People's ability to repay the loan, and supersedes the private interests of individual property owners. Thus, Defendants' failure to conduct a triennial property tax assessment influences not only the property

Case 1:05-cv-00038     Document 30-2     Filed 04/14/2006     Page 1 of 23

owners on Guam, who are being denied their constitutional rights by these officials' failure to equally and fairly administer laws, but the entire economy of the Territory.

The opposition relies upon the United States Supreme Court's decision in *Pennsylvania v. New Jersey*, 426 U.S. 660, 663, 96 S. Ct. 2333 (1976). In that case, the Commonwealth of Pennsylvania sought to invoke the Court's original jurisdiction, under Article III, § 2 of the United States Constitution, which confers original jurisdiction on the Supreme Court over suits between states or by one state against a citizen of another state. *See* U.S. Const. art. III, § 2. The Supreme Court held that, for a state to have *parens patriae* standing to invoke the Court's Article III, § 2 jurisdiction, the state must not be litigating merely "as a volunteer the personal claims of it citizens," *Pennsylvania v. New Jersey*, 426 U.S. at 666, but that there must also be some actual sovereign or quasi-sovereign interest of the state itself at stake. *Id.* The decision, however, does not preclude a State from bringing a *parens patriae* action on behalf of individual citizens seeking to protect their constitutional rights. Indeed, the U.S. Supreme Court's decision in *Pennsylvania v. New Jersey* supports the legitimacy of *parens patriae* suits by states. *Id.* at 666 (citing *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 257-60, 92 S. Ct. 885, 888-90, 31 L. Ed. 2d 184 (1972)).

In *Hawaii v. Standard Oil. Co.*, the Court considered whether the state of Hawaii had *parens patriae* standing to bring an antitrust action on behalf of individual consumers for violations of the Clayton Act, 38 Stat. 731, 15 U.S.C. § 15. *Hawaii v. Standard Oil. Co.*, 405 U.S. at 252-53. The Court held that Hawaii had no such standing, but only because the statutory language of the Clayton Act itself provided a direct statutory remedy to injured individuals (including the State of Hawaii in its

proprietary role), without the need for the state to represent their interests. *Id.* at 266. The Court did not hold that the common law precluded a state from representing its citizens in a *parens patriae* role, even in class action suits. *Id.* In analyzing the lower court's action denying *parens patriae* standing, the majority agreed that "[t]he District Court dismissed Hawaii's class action only because it was unwieldy; it did not hold that a State could never bring a class action on behalf of some or all of its consumer citizens." *Id.* The Court elaborated that "*parens patriae* actions may, in theory, be related to class actions, but the latter are definitely preferable in the antitrust area." *Id.*

Justice Douglas, dissenting, opined that "injury to the collective will commonly include[s] injury to members of the collective", *id.* at 269, and argued that there was no way to distinguish this case from the Court's prior decision in *Georgia v. Pennsylvania Ry. Co.,* 324 U.S. 439, 65 S. Ct 716, 89 L. Ed. 1051 (1945), which held that a State could sue as *parens patriae* under antitrust laws for injury to the State's economy resulting from conspiracy to restrain trade and commerce through the fixing of railroad rates. Justice Douglas reminded the majority of the High Court's earlier pronouncement:

> Georgia as a representative of the pubic is complaining of a wrong, which if proven, limits the opportunities of her people, shackles her industries, retards her development, and relegates her to an inferior economic position among her sister States. These are matters of grave public concern in which Georgia has an interest apart from that of particular individuals who may be affected.

*Hawaii v. Standard Oil. Co.,* 405 U.S. at 268 (citing *Georgia v. Pennsylvania Ry. Co.,* 324 U.S. at 451, 65 S. Ct 723).

The matter currently before this Court is not an antitrust matter subject to Federal statutory remedies. In addition, the People are not invoking the United States Supreme Court's jurisdiction under Article III, § 2 of the United States Constitution.

Thus, the *Hawaii v. Standard Oil. Co.* limitations on *parens patriae* standing do *not* apply here. Moreover, the right of the citizens of Guam to the fair and equal application of their laws pertaining to the assessment of their property and the payment of their taxes is of such critical importance to the economy of the Territory and its wellbeing that the Government of Guam has asserted a sovereign or even quasi-sovereign interest sufficient to support parens patriae standing.

Two recent decisions by state and Federal courts in New York have upheld the authority of the New York State Attorney General to bring suit on behalf of the citizens of New York. In *People v. Grasso*, ___ N.Y.2d ___, 2006 WL 657115 (N.Y. Sup. Ct. 2006), a New York trial court held that the New York Attorney General had *parens patriae* standing to bring an action against the former CEO and head of the New York Stock Exchange for reimbursement of allegedly excessive compensation. *Id.* at *4. In its decision, the court stated that, even though individual investors had legal remedies available to them, the Attorney General had the authority to represent the public's interest:

> Neither is the Attorney General seeking to act on behalf of the seatholders, whose private interest in the success of for-profit trading combines with the lack of any meaningful financial incentive to lower NYSE expenses. That the [Not-For-Profit Corporation Law] enables these seatholders to pursue claims on their own behalf and where they choose not to pursue such claims does not otherwise detract from the substantial public interest at stake in this action. Rather, as discussed above, the Attorney General represents the investing community that lacks the legal capacity to sue here, in order to redress the NYSE's failure to act within the realm of its internal corporate governance or regulatory frameworks. By granting [defendant's] allegedly unreasonable compensation, the NYSE board failed to insure the integrity and viability of the NYSE as an institution which in turn, affects the interests of the New York investing public. Accordingly, the Attorney General has the authority bring the challenged claims.

*Id.* at *7.

In *State of New York ex rel. Spitzer v. Cain*, \_\_\_\_ F. Supp. 2d \_\_\_\_, 2006 WL 337468 (S.D.N.Y 2006), the district court affirmed the New York Attorney General's power to defend the rights of the state's citizens against protesters who blocked access to an abortion clinic. The *Cain* decision recognized the State of New York's sovereign economic interest in keeping open free and unfettered access to an abortion clinic:

> It is not fatal to the plaintiffs' *parens patriae* standing that the alleged violations of [the Freedom of Access to Clinic Entrances Act] might have directly impacted only a relatively small number of people. The Court has warned that focusing solely on the number of directly affected individuals will lead to too narrow a view of the interests at stake. A court must therefore consider indirect effects of the injury as well as direct ones to determine whether the state has alleged injury to a sufficiently substantial segment of its population to justify *parens patriae* standing. It does not matter that the defendants have focused their efforts on a single provider. The defendants' actions at the Center may deprive any number of persons of the opportunity to receive reproductive health services.

> In this regard, it is significant that the State of New York has passed its own legislation, under which the plaintiffs also state a claim in this action, designed to protect access to reproductive health care facilities. In [*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 102 S. Ct. 3260, 73 L. Ed. 2d 995 (1982)], the Supreme Court explained that a "helpful indication in determining whether an alleged injury to the health and welfare of its citizens suffices to give the state standing to sue as *parens patriae* is whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers." *Snapp*, 458 U.S. at 607. Here the State has attempted to address the problem through its legislative process, offering further assurance that the type of injury is of sufficient magnitude and concern to justify a *parens patriae* suit.

*Cain*, \_\_\_\_ F. Supp. 2d at \_\_\_\_, 2006 WL 337468 at *12 (some citations and quotation marks omitted).

In Guam, as in New York, the legislature has taken action as part of its lawmaking powers and created a law requiring property assessments. Strong economic reasons justify a law requiring triennial assessment of property taxes and these reasons

support a finding that the Attorney General of Guam has sufficient *parens patriae* standing to bring this action to compel a triennial assessment. It is unlikely that an individual property owner would have the ability to bring an action to compel a government official to direct his agencies to conduct the type of appraisals required under Guam law. Finally, a Guam statute gives the Attorney General standing to bring this action as *parens patriae*. *See* discussion at Part III, *infra*. Therefore, the Attorney General has *parens patriae* standing to bring this action and Defendant's motion to dismiss on grounds that the Attorney General lacks standing must be denied.

In addition to the foregoing, the Attorney General maintains an independent duty to protect the public interest. MANAGEMENT PLANNING DIV., PA. DEP'T. OF JUSTICE, A HISTORY OF THE ATTORNEY GENERAL IN PENNSYLVANIA 1-15 (1972) (Attorney General is legal defender of the public interest and the rights of individual citizens). An Attorney General represents the public interest and must consider ramifications relative to government officials' wishes. *Feeney v. Commonwealth*, 373 Mass. 359, 366 N.E.2d 1262 (Mass. 1977). *People ex rel. Hartigan v. E & E Hauling, Inc.*, 180 Ill. Dec. 271, 153 Ill.2d 473, 607 N.E.2d 165 (Ill. 1992). Enforcing the law to protect the public interest in benefiting from that law, even if against government officials, is an integral part of an Attorney General's responsibility.

## III.

## The Attorney General of Guam's Enabling Legislation Confers Standing & Mandates Action to Protect the Public Interest.

Guam law confers standing on the Attorney General to bring this case. Section 30103 of Title 5 of the Guam Code Annotated provides in relevant part:

The Attorney General shall have, in addition to the powers expressly conferred upon him by this Chapter, those common law powers which include, but are not limited to, the right to bring suit to challenge laws which he believes to be unconstitutional and to bring action on behalf of the Territory representing the citizens as a whole for redress of grievances which the citizens individually cannot achieve, unless expressly limited by any law of Guam to the contrary.

5 G.C.A. § 30103. Because Congress incorporated language from Illinois and other "chief legal officer" jurisdictions, *supra*, such interpretive authority of these jurisdictions is instructive as to the Attorney General of Guam's scope of responsibility. 48 U.S.C. § 1421g(d)(1). *Department of Mental Health v. Coty*, 38 Ill. 2d 602, 232 N.E.2d 686 (Ill. 1967); *People ex rel. Scott v. Briceland*, 3 Ill. Dec. 739, 65 Ill. 2d 485, 359 N.E.2d 149 (Ill. 1976); *Wade v. Mississippi Cooperative Extension Service*, 392 F. Supp. 229, 232 (N.D. Miss. 1975).

The instant case challenges the constitutionality of a law, namely § 24306 of the Guam Real Property Tax Law. *See* 11 G.C.A. § 24306. Specifically, the People's complaint alleges: "Notwithstanding any other provision of law, if the valuation provided for in this § 24306 is not reascertained every three (3) years as required by this Section, then the last completed valuation as supplemented by the annual adjustments provided for in § 24307 shall be the property tax valuation under this Chapter." Compl. at ¶ 9. The People have alleged that this provision violates the uniformity requirement of 48 U.S.C. § 1423a, as well as due process and equal protection, and that the Government has standing to bring this case on that basis.

Moreover, the Attorney General of Guam maintains standing under § 30103 because the relief sought by this action is relief which individual taxpayers would have no standing to achieve. The Enforcement of Proper Government Spending Act, 5 G.C.A. Ch. 7, limits taxpayer standing to bring suits to restrain illegal expenditures

and recover damages for illegal expenditures. *See* 5 G.C.A. §7101. In addition, an individual taxpayer who believes his property to have been illegally assessed for property tax purposes under § 24306 of the Real Property Tax Law cannot bring an action to have that provision declared unconstitutional or to enjoin its enforcement, because declaratory relief and injunctive relief are equitable remedies, and equitable remedies are unavailable to individual taxpayers, who must instead seek a legal remedy by appealing to the Board of Equalization under 11 G.C.A. § 24511.

In the Memorandum of Points and Authorities in Support of the Motions, the opposition argues that the Attorney General should be denied declaratory and injunctive relief because taxpayers have an adequate remedy at law in the form of the opportunities provided by statute to challenge an unlawful or invalid assessment or levy. *See* Oppositions' Memo at pp. 6-7. In so arguing, the opposition necessarily implies that the declaratory and injunctive relief sought in the instant case is redress for grievances which the citizens individually cannot achieve. The fact that taxpayers individually cannot achieve the relief sought is reason enough to accord the Attorney General (Government) standing to achieve that relief for them. Hence, the Attorney General has standing to sue on behalf of the People of Guam (Government) under 5 G.C.A. § 30103 to bring the instant action, either under his common law powers to "bring suit to challenge laws which he believes to be unconstitutional" or under his common law power "*to bring action on behalf of the Territory representing the citizens as a whole for redress of grievances which the citizens individually cannot achieve, unless expressly limited by any law of Guam to the contrary.*" *See* 5 G.C.A. § 30103.

Contrary to the Defendants' contentions, the Attorney General of Guam need not adduce a sovereign or quasi-sovereign interest in order to invoke *parens patriae* standing in this case. A showing of sovereign or quasi-sovereign standing is only required by judge-made formulations of *parens patriae* standing. On Guam, *parens patriae* standing is conferred upon the Attorney General of Guam by statute. *See* 5 G.C.A. § 30103 ("*The Attorney General shall have, in addition to the powers expressly conferred upon him by this Chapter, those common law powers which include, but are not limited to, the right . . . to bring action on behalf of the Territory representing the citizens as a whole for redress of grievances which the citizens individually cannot achieve, unless expressly limited by any law of Guam to the contrary.*"). Thus, pursuant to statute, the Attorney General of Guam has standing to bring an action *parens patriae* if (1) the action is one for redress of grievances which the citizens cannot individually achieve, and (2) the bringing of the action *parens patriae* is not expressly limited by any law of Guam to the contrary. There is no requirement that the action also further a sovereign or quasi-sovereign interest.

Finally, the opposition argues that, unless Congress enacts a Federal law authorizing the Attorney General of Guam to engage in *parens patriae* suits against the Territory's Officers, the Attorney General lacks such power, because Guam is a Federal entity and the Governor and Director are Federal officers. *See* Oppositions' Memo at p. 6. In fact, Congress has already enacted such a law. *See* 48 U.S.C. § 1421g(d)(1). The Guam Supreme Court, in *A.B. Won Pat Guam Int'l Airport Auth. v. Moylan*, 2005 Guam 5, *cert. denied*, ___ U.S. ___, 126 S. Ct. 338, 163 L. Ed. 2d 50 (2005), has construed § 1421g(d)(1) as bestowing common law powers and duties upon the

Attorney General of Guam and granting him the authority to engage in *parens patriae* suits against the Territory's officers. *A.B. Won Pat Guam Int'l Airport Auth.*, 2005 Guam 5 at ¶ 2. The case though is being challenged before the Ninth Circuit on other interpretative grounds in *Attorney General v. Guam International Airport Authority*, Case Number 03-15823.

In addition, the Attorney General of Guam has since his election in 2003 had his right to sue on a *parens patriae* theory upheld in cases, such as the Decision and Order in *Moylan v. Camacho*, Case Number SP230-03 (Guam Super. Ct. Nov. 12, 2003). **Exhibit G.** In that case a Superior Court of Guam judge, who is now holding the Federal Magistrate Judge position in the U.S. District Court of Guam, held that the Attorney General's common law powers include standing to sue the Governor of Guam for redress of injuries to the public. *See id.* at p. 37. The judge thoroughly analyzed the Attorney General of Guam's Congressional history and statutory responsibilities. Therefore, Defendants' motion to dismiss on grounds that the Attorney General of Guam lacks standing must be denied.

## IV.

## Sufficient Indicia of Sovereignty Exists for Guam to Maintain *Parens Patriae* Authority.

While the Attorney General of Guam acknowledges the powers granted to Congress under the Territorial Clause of the United States Constitution, *see* U.S. Const. art. IV, the courts should look at Guam, not in a negative context as in the past, where the courts have held that, if Guam was not given a specific power, it does not possess it,

*People v. Okada (II)*, 715 F.2d 1347, 1347-48 (9th Cir. 1983), *cert. denied*, 469 U.S. 1021, 105 S. Ct. 441, 83 L. Ed. 2d 367 (1984); *Sakamoto v. Duty Free Shoppers, Ltd.*, 764 F.2d 1285, 1286 (9th Cir. 1985), *cert. denied*, 475 U.S. 1081, 106 S. Ct. 1457, 89 L. Ed. 2d 715 (1986); *People v. Guerrero*, 290 F.3d 1210, 1216-17 (9th Cir. 2002), but in a positive context, looking at what Congress has done in fact. The United States Supreme Court has directed that the Organic Act be read in its overall context, stating in *Gutierrez v. Ada*, 528 U.S. 250, 120 S. Ct. 740, 145 L. Ed. 2d 747 (2000), that, as a rule, "[t]o ask the question is merely to apply an interpretive rule as familiar outside the law as it is within, for words and people are known by their companions." *Id.* at 255. This court should use that same rationale to examine the Organic Act as a whole. The Territorial Government maintains a duty to protect the citizens of the Unite States against government officials who violate the laws of Guam, and of Congress, and to allow actions which seek to redress such wrongs.

Since *Okada*, there have been a number of amendments to the Organic Act. In one such amendment, Congress overturned the specifics of *Okada* by amending the jurisdiction of the Federal appellate courts. *See* 48 U.S.C. § 1493, as amended in 1984. Another amendment to the Organic Act reversed the effects of *People v. Olsen*, 431 U.S. 195, 97 S. Ct. 1774, 52 L. Ed. 2d 250 (1977), which would have disallowed a local supreme court created by the Guam Legislature in 1974. These amendments and others show that Congress intended the Organic Act to have a broader scope than that interpreted by some of the courts. *See, e.g.*, 48 U.S.C. § 1424 *et seq.*, as amended in 1984.

For instance, the Organic Act was amended to give power directly to the people

via initiative, referendum and recall. *See* 48 U.S.C. § 1422a, as amended in 1982. The authorization for the local courts has been significantly amended to make the courts a full-fledged third branch of government. *See* 48 U.S.C. § 1424-1 *et seq.*, as amended by P.L. 108-378. The power of the Guam Legislature has been increased to cover all "rightful subjects of legislation" for the purpose of clarifying the legislature's power to "provide Guam with a greater measure of self-government". H.R. Rep. No. 105-742 (1998), 1998 WL 658802 at *3. The Office of Attorney General was elevated and empowered by Congress recently in 1998 as an Organic Act office to enforce the law from a Constitutional plateau. 48 U.S.C. § 1421g(d)(1). *Haeuser v. Dept. of Law*, 97 F.3d 1152, 1156 (9th Cir. 1996). Congress afforded the Guam Legislature the right to make the post elected, which it did the following year in 1999. *Id.* Guam P.L. No. 25-44 (codified 5 G.C.A. § 30101). The Attorney General of Guam was made the *"Chief Legal Officer of the Government of Guam"* by Congress, thereby elevating and empowering the position. *See* H.R. Rep. No.105-742 (1998).

Also, the courts have held that Guam has sufficient indicia of sovereignty to have inherent sovereign immunity. *Marx v. Gov't of Guam*, 866 F.2d 294, 298 (9th Cir. 1989). In short, Congress has given Guam powers as close to those of a state as is possible without incorporating Guam into the Union.

Therefore, this Court should view Guam and its government as having an existing, functioning government. It should not view Guam as an entity having mere specks of powers here and there. Congress has created a territorial government, and statutorily equipped the territorial government with processes to protect U.S. citizens within the U.S. Territory, such as a Congressionally created and empowered office of

Attorney General of Guam. The Territorial Government was not created by Congress to oppress the people, but to protect their civil and property rights through its Organic Act offices. Congress has the power to change the system in the future, as it has done in the past, but for the present we should look at the Government of Guam and its powers as a complete entity, as a total reading of the Organic Act requires.

Guam should not be treated in the same manner as the District of Columbia because, first, a separate clause of the United States Constitution governs the District, and, second, that clause mandates Congressional control over the District. In its present state, while the District exercises considerable self-government, Congress exercises more control over the District than it exercises over Guam. Therefore, sovereignty principles applicable to the District do not apply to Guam, and Defendant's motion to dismiss should be denied.

# V.

## Collateral Estoppel is Inapposite.

### A. In Guam, a Judgment is not Final for Purposes of Collateral Estoppel Until the Time for Appeal of the Judgment has Expired, or, if an Appeal is Mounted, when it is Resolved.

Defendants argue that issue preclusion, otherwise known as collateral estoppel, bars this Court from considering the issues in this case. However, collateral estoppel does not apply to this case.

In *Ada v. Gov't of Guam,* 179 F.3d 672 (9th Cir. 1999), *rev'd on other grounds sub nom. Gutierrez v. Ada,* 528 U.S. 250, 120 S. Ct. 740, 145 L. Ed. 2d 747 (2000), the Ninth Circuit Court of Appeals held that, in Guam, a judgment is not final for purposes

of *res judicata* while the judgment is on appeal. *Ada v. Gov't of Guam,* 179 F.3d at 676 n.3. In the instant case, the 90-day period for appealing the Ninth Circuit's decision in the case sought to be asserted here as *res judicata* to the United States Supreme Court has not yet expired. *See In re Request of Governor Camacho Relative to Interpretation and Application of Section 11 of Organic Act of Guam,* Case No. 03-72836, slip op. at 1 (9th Cir. Mar. 6, 2006) ("the Bond Case") (dismissing appeal due to loss of jurisdiction as the result of Congressional enactment). Therefore, collateral estoppel clearly does not apply to bar the instant action. Moreover, weight should be given to the fact that the Ninth Circuit Court of Appeals granted the writ of certiorari petition by the Attorney General of Guam based upon the merits of the appeal, and the case was only recently dismissed for lack of jurisdiction, not on its merits, because of a law the Judiciary of Guam was able to have Congress pass which *inadvertently* divested the Ninth Circuit of its jurisdiction after the Bond Case was briefed and argued, yet was pending decision.

In *Ada v. Gov't of Guam,* the Ninth Circuit held that a Guam Superior Court decision on the meaning of the phrase "votes cast" in 48 U.S.C. § 1422 of the Organic Act did not have issue preclusive effect, stating:

> Gutierrez does not contend that the Guam Superior Court's order should be given preclusive effect. We agree that we are not bound by the decision of the Guam Superior Court, if for no other reason than because it is currently on appeal to the Supreme Court of Guam. Although we find no Guam decision holding that a judgment on appeal has no preclusive effect, title 6, § 4209 and title 7, § 26707 of the Guam Code, which govern the preclusive effect of final judgments, are essentially identical to California Civil Procedure Code §§ 1908 and 1049 respectively, and therefore should be similarly interpreted. "Appellate courts have consistently recognized that decisions of California courts which predate the enactment of the Territorial Laws are controlling authority on issues of the statutory construction and effect of Guam laws, and that California cases

subsequent to the adoption of the Guam codes while not binding, are persuasive." *Roberto v. Aguon*, 519 F.2d 754, 755 (9th Cir. 1975). It has been long established in California that a judgment is not final for purposes of res judicata while the judgment is on appeal. *See, e.g., Brown v. Campbell*, 100 Cal. 635, 35 P. 433, 436 (1893) (citing Cal. Civ. Proc. Code. § 1049); *Agarwal v. Johnson*, 25 Cal.3d 932, 160 Cal. Rptr. 141, 603 P.2d 58, 72 n.11 (1979) (same). Therefore, it appears that the Guam Superior Court's order is not entitled to preclusive effect.

*Ada v. Gov't of Guam,* 179 F.3d at 676 n.3.

Section 26707 of the Guam Civil Procedure Code was adopted by the Guam Legislature in 1953 from an identical provision in the California Civil Procedure Code, § 1049, and remains unchanged to this day. In consequence, California decisions construing that § 1049, which predate the enactment of § 26707 on Guam, are binding precedent on Guam. Thus, *Brown v. Campbell*, 100 Cal. 635, 35 P. 433 (Cal. 1893), and its progeny are binding precedent on Guam.

Section 26707 provides:

**When Actions Deemed Pending.** An action is deemed to be pending from the time of its commencement until its final determination upon appeal, *or until the time for appeal has passed,* unless the judgment is sooner satisfied.

7 G.C.A. § 26707 (emphasis added). Significantly, this statute provides that an appeal is pending until it is finally determined or the time for appeal has passed. Thus, under *Ada v. Gov't of Guam,* collateral estoppel does not bar the instant action because the time for appeal of the Bond Case to the United States Supreme Court has not expired. Furthermore, once the Attorney General files a petition for writ of certiorari to the United States Supreme Court, Defendants cannot avail themselves of collateral estoppel arguments to bar this action until that appeal is finally resolved.

The Oppositions' Memo relies on *Robi v. Five Platters, Inc.,* 838 F.2d 318, 327

(9th Cir. 1988), arguing that the pending appeal in the Bond Case does not diminish the preclusive effect of the judgment in the Bond Case. However, the *Robi* decision is inapposite, because it relates only to appeals from Federal cases. The appeal in the Bond Case, in contrast, is from the Guam Supreme Court, i.e., a Territorial court, not a Federal court. Interestingly, the Guam Supreme Court decided the case, which placed a Federal borrowing limit upon government officials, essentially within about a three week period. In that case the bon petition was filed on July 1, 2003, briefs submitted and replied to by July 9 at 10:00 a.m., and the oral argument held on July 9th at 10:00 a.m. The decision was issued about 2 weeks later on July 23, 2003. **Exhibit H.** The Ninth Circuit accepted the appeal on October 23, 2003. **Exhibit I.**

In determining the preclusive effect of a state court judgment in a Federal court, Federal courts look to state law. *Manufactured Home Communities, Inc. v. City of San Jose*, 420 F.3d 1022, 1031 (9th Cir. 2005) (citing *Palomar Mobile Home Park Ass'n v. City of San Marcos*, 989 F.2d 362, 364 (9th Cir. 1993)). Therefore, this Court should follow the rule established by the Ninth Circuit in *Ada v. Gov't of Guam*, which was based on construction of Guam statutes, and hold that collateral estoppel cannot apply until the appeal period runs, or, if the case is appealed, the case is finally resolved. Since collateral estoppel does not bar this action, Defendant's motion to dismiss on those grounds must be denied.

### B. Issue Preclusion does not Apply Because the Issues Involved in the Bond Case were Purely Questions of Law.

Moreover, collateral estoppel would not apply even if the Bond Case were not on

appeal, because of the exception to collateral estoppel for "unmixed questions of law" in successive actions involving substantially unrelated claims. The United States Supreme Court first delineated this exception in *United States v. Moser,* 266 U.S. 236, 242, 45 S. Ct. 66, 69 L. Ed. 262 (1924), and further developed it in *United States v. Stauffer Chem. Co.,* 464 U.S. 165, 170-73, 104 S. Ct. 575, 578-79 (1984), and *Montana v. United States,* 440 U.S. 147, 99 S. Ct. 970, 59 L. Ed. 2d 210 (1979); *accord Collins v. Alaska,* 823 F.2d 329 (9th Cir. 1987); *Segal v. Am. Tel. & Tel. Co. Inc.,* 606 F.2d 842 (9th Cir. 1979).

The *Moser* Court had to determine whether to give collateral estoppel effect in subsequent lawsuits involving different causes of action to a Court of Claims decision that the claimant had served as a naval officer during the Civil War. *Moser,* 266 U.S. at 242. The United States Supreme Court held that the Court of Claims' prior decision respecting the claimant's status as a naval officer precluded re-litigation of this issue:

> The contention of the government seems to be that the doctrine of *res judicata* does not apply to questions of law; and in a sense, that is true. It does not apply to unmixed questions of law. Where, for example, a court in deciding a case has enunciated a rule of law, the parties in a subsequent action upon a different demand are not estopped from insisting that the law is otherwise, merely because the parties are the same in both cases. But a *fact, question,* or *right* distinctly adjudged in the original action cannot be disputed in a subsequent action, even though the determination was reached upon an erroneous view or by an erroneous application of the law. That would be to affirm the principle in respect to the thing adjudged but, at the same time, deny it all efficacy by sustaining a challenged to the grounds upon which the judgment was based. A determination in respect of the status of an individual upon which his right to recover depends is as conclusive as a decision upon any other matter.

*Id.* at 242 (citations omitted). Thus, since the issue decided in the case sought to be asserted as collateral estoppel was an unmixed question of law, specifically purely a question of law, and the question had come up again in a different case with a different

cause of action, collateral estoppel principles would *not* bar re-litigation of this pure question of law.

However, even though under this exception, questions of law can be re-litigated in a subsequent action, the fact, question or right decided in the first action cannot be re-litigated. Consequently, in the instant case, even though the issues of law decided in the Bond Case, specifically whether the present property appraisal system is valid, could be re-litgated in the instant case, the fact, question or right decided, namely whether the present property appraisal system is valid *for the purposes of determining the debt limitation* of § 11 of the Organic Act — could not be re-litigated. However, this is not even the case as that case is on appeal, and what's worse is that those same government officials have now failed to conduct the appraisal for about 12 years since the issue was brought to court, as opposed to 10 years in 2003 when the case was first filed. The egregiousness of the government official's actions in failing to conduct an appraisal to value the property and determine if Congress' debt ceiling has been reached, yet continuing to try to borrow money and taxing the U.S. citizens residing on Guam increases daily.

The Guam Supreme Court in the Bond Case alluded to the possibility of re-litigating the question of whether the present property appraisal system is valid for the purposes of property taxation, when it said:

> We further emphasize that it is unnecessary to address the AG's contention that the 2002 tax list cannot be used for taxation purposes because of the alleged decline in values of property on Guam. Such an inquiry concerning the accuracy of the tax list is more relevant in a case brought for the purposes of challenging the propriety of tax assessments, and in any event, necessarily requires the benefit of the fact-finding process and the mechanisms available in such proceedings. For purposes here, where the question is whether the 2002 tax list can be relied upon in calculating the debt limit, all that is required is a determination of whether the 2002 tax list was developed in accordance with the sufficient

procedures provided under the law. To the extent that sufficient procedures existed to ensure a fair and reasonable valuation, we are satisfied that the current tax list may be used to calculate the debt limit.

2003 Guam 16 at ¶12.

In *Montana v. United States*, 440 U.S. 147, 99 S. Ct. 970, 59 L. Ed. 2d 210 (1979), the Court held that, for this exception to operate, the claims in the case sought to be asserted as *res judicata* must be "substantially unrelated" to the claims sought to be precluded. The *Montana v. United States* Court found that the claims in the two cases at issue were "closely aligned in time and space." *Id.* at 162-63, 99 S. Ct. at 978. In the instant case, *however*, the claims involved in the Bond Case and the instant case are substantially unrelated. The Bond Case dealt with government officials borrowing money and whether that violated Congress' borrowing limitation in 48 U.S.C. § 1423a, versus the requirement that real property taxation not occur without due process of law, including government officials adequately valuing real property before assessing taxes and maintaining a functioning real property Board of Equalization to challenge assessed taxes. The issues are materially an substantially different between the Bond Case and the instant action. Therefore, collateral estoppel does not apply.

In the Bond Case, the Governor claimed that the legal mechanisms in place for determining the appraised value of property for purposes of property taxation were sufficiently accurate to allow the appraised value of property appearing in the tax lists to be relied upon in determining whether the debt limitation had been exceeded. Here, in contrast, the Attorney General of Guam claims that the Defendants' practice of not conducting a triennial assessment but instead relying on the "last completed valuation as supplemented by the annual adjustments provided for in § 24307", *see* 11 G.C.A.

§ 24306, denies the tax lists the accuracy required of individual property tax assessments. This, in turn, impinges on the uniformity requirement of 48 U.S.C. § 1423a, and the requirements of due process and equal protection.

In summary, the claim in the Bond Case dealt with the reliability of tax appraisals when used for determining the debt limit, whereas the claim in the instant case deals with the reliability of those same appraisals when used for property tax assessment. The Guam Supreme Court in the Bond Case evaluated the necessity of an appraisal relative to government borrowing, as opposed to taxation.

The Guam Supreme Court itself said that the failure to conduct the triennial assessment does not affect the validity of the appraisals upon which the debt limitation is determined. As a result, the claims in these cases are substantially unrelated, insofar as one relates to the uses of the appraisals for purposes of property taxation, and the other relates to uses of the appraisals for purposes of determination of the debt limit. Therefore, collateral estoppel does not apply to bar this action.

In *United States v. Stauffer Chem. Co.*, 464 U.S. 165, 104 S. Ct. 575, 78 L. Ed. 2d 388 (1984), the Court stated:

> The exception seems to require a determination as to whether an "issue of fact" or an "issue of law" is sought to be relitigated and then a determination as to whether the "issue of law" arises in a successive case that is so unrelated to the prior case that relitigation of the issue is warranted."

*Stauffer Chem.*, 464 U.S. at 171, 104 S. Ct. at 579.

The Guam Supreme Court in its decision in the Bond Case did not address the question of whether the tax appraisal system, and particularly the reliance on an appraisal conducted in 1993, resulted in accurate values for purposes of ad valorem

property taxation. Instead, that issue is addressed in the instant case, which asks whether the tax appraisal system, and particularly the reliance on an appraisal conducted in 1993, has resulted in values for purposes of property taxation that are sufficiently accurate in light of the 48 U.S.C. § 1423a requirement of uniformity, and the requirements of due process and equal protection. Moreover, the issue then was whether a comprehensive appraisal requirement every three (3) years which was not done for about ten (10) years when the suit was filed and decided was still valid, not after twelve (12) years which is now the case. Thus, collateral estoppel does not bar this action and Defendant's motion to dismiss on those grounds must be denied.

# VI.

## Count 1 States a Valid Claim for Failure to Uniformly Assess Taxes.

The Organic Act provides that "[t]axes and assessments on property, internal revenues, sales, license fees, and royalties for franchises, privileges, and concessions may be imposed for the purpose of the government of Guam *as may be uniformly provided* by the Legislature of Guam". 48 U.S.C. § 1423a (emphasis added). Two recent Pennsylvania cases have held that a constitutional mandate requiring uniformity is satisfied when a taxing authority assesses all property in a taxing district at the same percentage of its actual value, because application of a uniform ratio ensures that each taxpayer will be held responsible for its *pro rata* share of the burden on government. *See Vees v. Carbon County Bd. Of Assessment Appeals*, 867 A.2d 742, 749 (Pa. Commw. Ct. 2005), and *Downingtown Area School Dist. v. Chester County Bd. Of*

*Assessment Appeals*, 819 A.2d 615, 620 (Pa. Commmw. Ct. 2003), *appeal granted in part*, 846 A.2d 74 (Pa. 2004).

In *Larson v. State*, 534 P.2d 854 (Mont. 1975), taxpayers brought a class action suit against the state, claiming that the state's use of a county-financed countywide appraisal by a private firm violated their constitutional right to uniformity in taxation. *Id.* at 855. The trial court entered declaratory judgment and injunction in favor of the plaintiffs and the state appealed. *Id.* The Montana Supreme Court noted at the outset that "violations of statutory uniformity requirements generally result in violations of equal protection-due process requirements." *Id.* at 857 (citing 71 Am.Jur.2d, State and Local Taxation, s 158).

The *Larson* court observed that, while there exists an "abundance of authority which finds no violation of constitutional or statutory mandates in the temporary inequalities which accompany a cyclical plan of reappraisal," *Larson*, 534 P.2d at 857 (citing *Hillock v. Bade*, 22 Ariz. App. 46, 523 P.2d 97 (Ariz. Ct. App. 1974), and W.W. Allen, *Real-estate Tax Equalization, Reassessment, or Revaluation Commenced but not Completed within the Year, as Violative of Constitutional Provisions Requiring Equal and Uniform Taxation*, Annotation, 76 A.L.R.2d 1077 (1961)), this does not hold true where a government carries on no plan of reappraisal at all:

> Here, the fatal flaw in the state's position is the absence of any plan. Without such a plan, there is no assurance of uniformity of appraisal method or of sequential selection of property for reappraisal. The state's position is even weaker than that of the taxing officials in *Sparks v. McCluskey*, 84 Ariz. 283, 327 P.2d 295, 297, where the Arizona court held: "We cannot subscribe to the proposition that grossly inequal values by the use of a specific method of assessment may be placed on a small portion of a class of property and remain subject to the disproportionately excessive value for an indefinite number of years in the future until the taxing officials can get around to using the same method upon the other like

properties."

*Larson*, 534 P.2d at 857. Because the state had used a private firm's appraisal to assess taxes in one county only, and because that appraisal placed a disproportionate share of the tax burden on the complaining taxpayers in that county, the Montana Supreme Court held that the state's actions violated the state constitution's requirement of uniformity in taxation. *Id.*

Taking the facts alleged in the instant Complaint as true, Guam, like the county in *Larson*, does not carry out any type of appraisal plan, having performed its last triennial appraisal in 1993 and <u>abandoned</u> the exercise thereafter. Moreover, since 2003 when the Bond Case litigation began, at Defendant Governor of Guam's own hand, Defendants have failed for the past two (2) years to begin the appraisal, which in 1993 took about a year to conduct. As a result, taxpayers whose properties have been subjected to a more recent reappraisal bear a disproportionate share of the tax burden in comparison with those taxpayers whose properties were last assessed prior to 1996 (comprehensive appraisals being valid for about 3 years based upon Guam's triennial appraisal requirement). Thus, Count I states a valid claim, because, if the triennial appraisal is not performed, the provision in § 24306 of the Real Property Tax Law permitting the tax assessor to use the last completed valuation supplemented by annual adjustments authorizes a non-uniform assessment of property for tax purposes. Therefore, Defendants' motion to dismiss for failure to state a claim relating to the uniformity violation should be denied.

/ / /

/ / /